# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | ~~James F. Holderman~~ RONALD A. GUZMAN | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 965 | **DATE** | 7/24/2001 |
| **CASE TITLE** | CORPORATE CAPITAL MANAGEMENT vs. FIRSTCOM CORP | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Pursuant to Memorandum Opinion and Order entered this day, plaintiff's motion for summary judgment is granted regarding liability for breach of contract as to the 40,116 unregistered shares of FirstCom stock. Status hearing is set for August 28, 2001 at 9:00 am.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | 7.25-01 | |
| | Docketing to mail notices. | | date docketed | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | docketing deputy initials | |
| | | | 7/24/2001 | |
| JS | courtroom deputy's initials | FILED FOR DOCKETING 01 JUL 25 AM 8: 12 | date mailed notice | |
| | | | JS | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CORPORATE CAPITAL MANAGEMENT,  )
LLC,                           )
                               )
        **Plaintiff,**       )
                               )      **00 C 965**
        **v.**          )
                               )      **Judge Ronald A. Guzmán**
FIRSTCOM CORPORATION,          )
                               )
        **Defendant.**   )
                               )

## MEMORANDUM OPINION AND ORDER

CCM Corporate Capital Management, LLC ("CCM"), holder of defendant FirstCom Corporation's ("FirstCom") (f/k/a InterAmericas Communications Corp. ("ICCA")) warrant to purchase shares of common stock, has moved for summary judgment as to FirstCom's liability for breach of contract for failing to register issuable shares and to file a registration statement with the Securities and Exchange Commission according to the terms of the warrant. For the reasons set forth below, the Court grants the motion.

### Facts

The following facts are undisputed. CCM is an investment banking firm that supplies financial consulting and advisory services. (Pl's LR 56.1(a)(3) ¶ 4.) FirstCom provides telecommunication services in Latin America. (*Id.* ¶ 5.)

In February 1997, ICCA entered into an agreement with CCM whereby CCM was to provide ICCA with a purchaser for $1,500,000.00 in securities. (Def.'s LR 56.1(b)(3)(B) ¶ 1.)[1] In exchange, CCM would earn a success fee of $90,000—representing 6% of the aggregate

---

[1] The Court notes that CCM failed to file a response to FirstCom's LR 56.1(b)(3)(B) Statement. The Court strictly enforces LR 56.1 and therefore deems all of the properly supported fact statements in FirstCom's LR 56.1(b)(3)(B) Statement admitted.



proceeds – and FirstCom would issue to CCM a warrant (the "Warrant Agreement") that granted CCM the right of purchase, at any time on or before February 2, 2002, 75,000 shares of FirstCom's common stock (the "Stock") at a price of $5.00 per share or particular number of shares determined by a clearly defined formula through a cashless exercise. (*Id.*; Pl.'s LR 56.1(a)(3) ¶ 7.) CCM did provide ICCA with a purchaser for the $1,500,000.00 in securities, and CCM was paid the success fee of $90,000.00. (Def.'s LR 56.1(b)(3)(B) ¶ 2.) On or about October 29, 1998, ICCA changed its name to FirstCom. (*Id.* ¶ 3.)

On October 25, 1999, CCM requested to purchase 75,000 shares of the Stock at $5.00 per share pursuant to the Warrant Agreement. (Pl.'s LR 56.1(a)(3) ¶ 10.) CCM did not tender payment at that time. (Def.'s LR 56.1(b)(3)(B) ¶ 21.) Consequently, FirstCom did not issue the requested shares to CCM. (Pl.'s LR 56.1(a)(3) ¶ 11.) On or about October 29, 1999, CCM elected to conduct a cashless transaction, rather than pay cash, as it was entitled to do under section 1(c) of the Warrant Agreement. (*Id.* ¶ 12; Def.'s LR 56.1(b)(3)(B) ¶ 10.) FirstCom issued to CCM a stock certificate, with a restrictive legend, in the amount of 40,116 shares. (Def.'s LR 56.1(b)(3)(B) ¶ 12.) FirstCom did not register the 40,116 shares within ninety days of the date of the closing. (Pl.'s LR 56.1(a)(3) ¶¶ 9, 13; Def.'s LR 56.1 (b)(3)(B) ¶ 2.)

FirstCom was in the process of negotiating an agreement regarding its merger with AT&T Corp. (Def.'s LR 56.1(b)(3)(B) ¶ 15.) Douglas Geib, Chief Financial Officer of FirstCom, determined that FirstCom could not as a practical matter alter the status quo under the merger agreement with AT&T Corp. by promising CCM that it would register the shares. (*Id.*)

On November 1, 1999, FirstCom made its first public announcement that FirstCom would be merging with AT&T Corp., and as a result the value of FirstCom stock began a steady and vigorous rise in price throughout November. (*Id.* ¶ 18.) By November 30, 1999, the stock was trading at $21.688 per share, as compared with $13.875 per share on November 1, 1999. (*Id.*) In December 1999, the price per share of FirstCom rose from $20.625 per share to $36.75 per share by the last day of the month. (*Id.* ¶ 20.)

After (1) CCM properly exercised the warrant for a cashless transaction on October 25,

1999 (*id.* ¶ 13), (2) FirstCom issued to CCM a stock certificate, with a restrictive legend in the amount of 40,116 shares on October 29, 1999 (*id.* ¶ 12); and FirstCom announced its merger with AT&T on November 1, 1999 (*id.* ¶ 15), CCM returned the stock certificate for 40,116 shares (*id.* ¶ 21). For the first time, CCM attempted to tender payment by a certified check for $375,000.00 representing the strike price for 75,000 shares. (*Id.*) However, despite CCM's return of the stock certificate for 40,116 shares, on February 1, 2000, CCM acted as owner of the 40,116 unregistered shares when it sold them to Paine Webber at the price of $25.066 per share for a gross sales price of $1,005,547.66 which was substantially below the fair market value of FirstCom's publicly traded common stock. (Pl.'s LR 56.1(a)(3) ¶ 14.)

## Discussion

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986). A "genuine issue of material fact exists only where 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Dribeck Importers, Inc. v. G. Heileman Brewing Co., Inc.*, 883 F.2d 569, 573 (7th Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). In considering such a motion, the court must view all inferences in the light most favorable to the nonmoving party. *See Regner v. City of Chicago*, 789 F.2d 534, 536 (7th Cir. 1986). Although, the district court's role on summary judgment is not to sift through the evidence and decide whom to believe, the court will enter summary judgment against a party who does not come forward with evidence that would reasonably permit a finder of fact to find in his or her favor on a material question. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

CCM argues that FirstCom breached its obligations under the Warrant Agreement by failing to register the shares. (Pl.'s LR 56.1(a)(3) ¶¶ 9, 13.) The Court agrees.

3

"[A] warrant is an option to purchase stock at a given price." *Bradford v. Crown-Bremson Indus., Inc.*, 255 F. Supp. 1009, 1012 (M.D. Tenn. 1964) (citing 6A William M. Fletcher *et al.*, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 2641 (perm. ed. rev. vol. 1997)). "It is a well-settled rule of corporate law that an option to purchase stock must be exercised, if at all, strictly in accordance with its terms." *Id.* (citing 12A William M. Fletcher *et al.* FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 5575 (perm. ed. rev. vol. 2001)). "The terms and conditions control as to the manner of acceptance, and the optionee must unequivocally accept according to these terms. If by the express terms of the option agreement payment of the purchase price, or a portion thereof, is required to accompany the optionee's election to exercise the option, then the making of such payment is necessary to the acceptance." *Id.* (citations omitted).

In order to determine whether FirstCom has breached, it is necessary to decide whether CCM accepted in accordance with the terms under the warrant. *See id.* at 1013. The court must examine the pertinent language of the agreement in order to ascertain what were the conditions of the option to purchase. *Id.*

Under the Warrant Agreement, CCM as the optionee had the right to purchase at any time before February 2, 2001, either 75,000 shares of Stock at a price of $5.00 per share or a particular number of shares determined by a clearly defined formula through a cashless exercise. (Def.'s LR 56.1(b)(3)(B) 1; Pl.'s LR 56.1(a)(3) ¶ 7.) CCM argues that it exercised the cash option under the Warrant Agreement for 75,000 shares of Stock. FirstCom disagrees and argues that CCM exercised the cashless transaction option, the formula for which resulted in 40,116 shares.

Section 1(a) of the Warrant Agreement provides the process to exercise the Warrant as following:

> Subject to the provisions hereof, the Warrant may be exercise . . . by presentation and surrender hereof to the Issuer at the address which, in accordance with the provisions of Section 9 hereof, is then effective for notices to the Issuer, with the Election to Purchase Form annexed hereto as Schedule One, duly executed and accompanied by payment to the Issuer as further set forth below in this Section 1, for the account for the Issuer, or the Exercise Price for the number of Warrant Shares specified in such form. . . . The Exercise Price for the number

4

of Warrant Shares specified in the Election to Purchase Form shall be payable in United States Dollars by certified or official bank check payable to the order of the Issuer or by wire transfer of immediately available funds to an account specified by the Issuer for that purpose.

(Def.'s LR 56.1(b)(1) Ex. B, Segrera Aff., Segrera Ex. A.) CCM argues that on October 25, 1999, it exercised its right under the Warrant to purchase 75,000 shares of the Stock at the price of $5.00 per share and sent to FirstCom a copy of the Warrant Agreement and Election to Purchase, as well as a cover letter on that date (Pl.'s LR 56.1(a)(3) ¶ 10; Def.'s LR 56.1(b)(3)(B) ¶ 8.) However, CCM did not send payment to FirstCom and merely inquired where to send payment. (Def.'s LR 56.1(b)(1) Ex. B., Segrera Aff., Segrera Ex. C.)

Thus, CCM never sent FirstCom $375,000.00 to purchase 75,000 shares of Stock on October 25, 1999 when CCM first notified FirstCom about its exercise of the Warrant. (Def.'s LR 56.1(b)(1) Ex. B, Segrera Aff., Segrera Ex. A.) CCM alleges that FirstCom failed to issue the 75,000 shares of Stock. (Pl.'s LR 56.1(a)(3) ¶11.) However, FirstCom had no obligation to issue the Stock until CCM sent payment as required under section 1(a) of the Warrant Agreement. (Def.'s LR 56.1(b)(1) Ex. A, Segrera Aff., Segrera Ex. B.)

Furthermore, it is undisputed that CCM ultimately elected the cashless exercise option rather than to pay cash as it was entitled to do under the Warrant Agreement. (Def.'s LR 56.1(b)(3)(B) ¶¶ 10-13.) Section 1(c) of the Warrant Agreement grants that, in lieu of exercising the Warrant Agreement for cash, "the Holder may elect to receive shares equal to the value of the Warrant." (Def.'s LR 56.1(b)(1) Ex. B, Segrera Aff., Segrera Ex. A.) It is undisputed that after CCM's proper election of the cashless exercise option, FirstCom calculated the cashless exercise at 40,116 shares and immediately provided CCM with the calculation of the net shares to be issued. (Def.'s LR 56.1(b)(3)(B) ¶ 10.) FirstCom issued to CCM a stock certificate with a restrictive legend in the amount of 40,116 dated October 29, 1999. (*Id.* ¶ 12.) On February 1, 2000, CCM, as owner of the 40,116 shares, sold them to Paine Webber. (Pl.'s LR 56.1(a)(3) ¶ 14.)

On January 5, 2000, CCM attempted for the first time to tender payment by a certified

check for $375,000.00 representing the strike price for 75,000 shares. (Def.'s LR 56.1(b)(3)(B) ¶ 21.) However, CCM did this only after: (1) CCM properly exercised the warrant for a cashless transaction on or about October 25, 1999 (*id.* ¶ 13); and (2) FirstCom issued to CCM a stock certificate, with a restrictive legend in the amount of 40,116 shares on October 29, 1999 (*id.* ¶ 12). At the same time, CCM returned the stock certificate for 40,116 shares. (*Id.* ¶ 21.) However, regardless of CCM's return of the stock certificate for 40,116 shares, on February 1, 2000, as noted above, CCM acted as owner of the 40,116 unregistered shares when it sold them to Paine Webber at the price of $25.066 per share for a gross sales price of $1,005,547.66 which was substantially below the fair market value of FirstCom's publicly traded common stock. (Pl.'s LR 56.1(a)(3) ¶ 14.) The only way CCM could have owned the 40,116 shares of Stock at the time of the sale to Paine Webber is if CCM had properly exercised the Warrant Agreement. Thus, the Court finds that FirstCom's registration of the shares was not a condition precedent to CCM's exercise of the Warrant Agreement. Instead, CCM's proper exercise of the Warrant Agreement and FirstCom's obligation to register the issuable shares of Stock under the Warrant Agreement are independent obligations. In sum, CCM accepted the cashless transaction according the terms of the Warrant Agreement and acted as owner of the shares resulting from the cashless transaction. The Warrant Agreement provides that CCM could have either elected the cashless option or the cash option, but not both. Therefore, if FirstCom has any liability for breach of contract, it must be based on the cashless transaction of 40,116 shares.

Next, the Court must determine whether FirstCom is liable for breach of contract. The Court finds that FirstCom is liable for breach of contract for failing to register the 40,116 shares.

The relevant part of the Warrant Agreement is section 8.1, which provides:

> The issuer shall use its best efforts to register promptly under the Securities Act, at the Issuer's expense (other than underwriting discounts and commissions, if any), all of the shares of Common Stock issuable upon the exercise of the Warrant issued to the Holder (the "Registrable shares") and in that connection shall file, by no later than ninety (90) days after the date hereof a registration statement with respect to the Registrable Shares (the "Registration Statement") with the Securities and Exchange Commission (the "SEC").

(Def.'s LR 56.1(b)(1) Ex. A, Segrera Aff., Segrera Ex. B.) This contractual provision states that

FirstCom is required to register "all of the shares of Common Stock issuable upon the exercise of the Warrant issued to the Holder promptly." (Pl.'s LR 56.1(a)(3) ¶ 8.)

It is undisputed that on or about October 25, 1999, CCM elected to conduct a cashless transaction, rather than pay cash, as it was entitled to do under section 1(c) of the Warrant Agreement. (Def.'s LR 56.1(b)(3)(B) ¶ 13.) Accordingly, FirstCom issued to CCM a stock certificate, with a restrictive legend, in the amount of 40,116 shares. (*Id.* ¶ 12.) Although CCM tendered 40,116 shares of its stock to plaintiff, these shares were not registered under the Act. (*Id.* ¶ 13.) As owner of the Stock, CCM sold the 40,116 unregistered shares to Paine Webber on February 1, 2000. (*Id.* ¶ 24.)

FirstCom opines that it did not make any representation to CCM that FirstCom would be able to provide CCM with registered shares of FirstCom stock in a cashless transaction. (Def.'s LR 56.1(b)(3)(B) ¶ 14.) However, under the unambiguous terms of the Warrant Agreement, the 40,116 shares of Stock issued to CCM in the cashless transaction fall within the meaning of "all of the shares of Common Stock issuable upon the exercise of the Warrant issued to the Holder" under section 8.1 of the Warrant Agreement. Therefore, FirstCom was required to use its "best efforts to register promptly under the Securities Act" and to file a registration statement with the SEC within ninety days with respect to the 40,116 shares. (*Id.*) In light of the unambiguous language used, the Court finds no basis for substituting an unfounded meaning for that clearly evidenced by the writing of the parties. *Security Options Corp. v. Devilliers Nuclear Corp.*, 472 F.2d 844, 846 (2d Cir. 1972). FirstCom has breached its obligation under the plain meaning of the terms of the Warrant Agreement.

In addition, section 1(c) of the Warrant Agreement provides in part:

> If the Fair Market Value (hereinafter defined) of one share of Common Stock is greater than the Exercise Price (at the date of calculation as set forth below), in lieu of exercising this Warrant for cash, the Holder may elect to receive shares equal to the value (as determined below) of this Warrant (or the portion thereof being canceled) by surrender of this Warrant at the principal office of the Issuer together with the properly endorsed Notice of Exercise and notice of such election in which event the Issuer shall issue to the Holder a number of shares of Commons Stock computed using the following formula;

$$X = \frac{Y(A-B)}{A}$$

Where  X = the number of shares of Common Stock to be issued to the Holder
Y = the number of shares of Common Stock purchasable under the Warrant or, if only a portion of the Warrant is being exercised, the portion of the Warrant being canceled (at the date of such calculation)
A = the Fair Market Value of one share of the Issuer's Common Stock (at the date of such calculation)
B = Exercise Price (as adjusted at the date of such calculation)

For purposes of the above calculation, Fair Market Value of one share of Common Stock shall be the average closing bid price (as reported by The Nasdaq SmallCap Market) of the Issuer's Common Stock for the Five (5) consecutive trading days ending on the trading day immediately preceding the date of the Election to Purchase.

(Def.'s LR 56.1 (b)(1) Ex. A, Segrera Aff., Segrera Ex. B.) The key event for purposes of ensuring CCM the benefit of its bargain was the registration of the shares. According to section 1(c) of the Warrant Agreement, FirstCom calculated the number of shares with the fair market value of the stock which was to be registered for public trade. Thus when CCM elected a cashless transaction instead of paying cash for 75,000 shares of Stock, CCM was to receive 40,116 registered shares of Stock which would have full fair market value.

FirstCom argues that the registration of 40,116 shares of Stock was impractical and unable to be accomplished in the short term in light of the merger. (Def.'s LR 56.1(b)(3)(B) ¶ 22; Def.'s LR 56.1(b)(1) Ex. C, Geib Dep. at 30-32.) Performance may be impracticable because "extreme and unreasonable difficulty, expense, injury or loss to one of the parties will be involved." RESTATEMENT (SECOND) OF CONTRACTS § 261 cmt. d (1981). "A party is expected to use reasonable efforts to surmount obstacles to performance . . . and a performance is impracticable only if it is so in spite of such efforts." *Id.* The fact that performance has become "economically burdensome or unattractive is not sufficient for performance to be excused." *Luria Bros. & Co., Inc. v. Pielet Bros. Scrap Iron & Metal, Inc.*, 600 F.2d 103, 112 (7th Cir. 1979); *see American Trading & Prod. Corp. v. Shell Int'l Marine Ltd.*, 453 F.2d 939, 942 (increases in costs in the amount of 33.3% or 50% have been held to be insufficient for impracticability).

8

Douglas Geib, FirstCom's Chief Financial Officer, stated that (1) FirstCom was in the process of a merger with AT&T; (2) there was a registration process moving forward with AT&T; and (3) to begin a separate registration process just for the CCM piece by itself would have required exactly the same disclosures that FirstCom was disclosing in the registration process with AT&T. (Def.'s LR 56.1(b)(3)(B) ¶ 15; Ex. C, Geib Dep. at 30-32). Geib stated that he was not sure that going through a similar process for registering CCM's shares would be practical. (*Id.*) These reasons, however, do not rise to the level of impracticability. At most they describe why registering the shares was unattractive to FirstCom. Under section 8.1 of the Warrant Agreement, FirstCom was required to use its best efforts to register all of the shares of Common Stock issuable upon the exercise of the Warrant. (Def.'s LR 56.1(b)(1) Ex. A, Segrera Aff., Segrera Ex. B.) FirstCom has failed to establish a genuine dispute as to whether it used its best efforts to register the 40,116 shares of Stock. FirstCom only asserts that registration for CCM's stock was not practical because it would have been a similar process to that going forward with AT&T. (Def.'s LR 56.1(b)(3)(B) ¶ 15; *see also* Def.'s LR 56.1(b)(1), Ex. C, Geib Dep. at 30-32.) This is no more than an excuse for making no effort at all, it is not evidence that FirstCom made its best effort.

In sum, this Court finds that based on the undisputed facts in the record, FirstCom breached its obligation under the Warrant Agreement to register the Stock and file a registration statement with the SEC. (Def.'s LR 56.1(b)(3)(A) ¶ 13.) Further, FirstCom has failed to raise a genuine issue as to a material fact regarding the impracticability of performing its obligations under the Warrant Agreement.

## CONCLUSION

For the reasons set forth above, the Court grants CCM's motion for summary judgment regarding FirstCom's liability for breach of contract as to the 40,116 unregistered shares of FirstCom stock [docket no. 18-1]. The only issue that remains is the amount of damages caused by FirstCom's breach. Upon receipt of this Memorandum Opinion and Order, the parties are instructed to set a status hearing date with this Court's courtroom deputy to be scheduled no later than two weeks after receipt.

**SO ORDERED**

ENTERED: 7/24/07

HON. RONALD A. GUZMAN
United States Judge